### Sansom, Trustee v. Ewell, etc.

(Decided October 6, 1914.)

Appeal from Laurel Circuit Court.

Reformation of Instruments—Action to Reform Deed—Mistake.— In an action to reform a deed, the question being whether there was a mistake in not excepting certain timber rights from the conveyance, held, that the evidence supports the judgment of the lower court to the effect that the timber sales in controversy were intended to be excepted from the deed, and not included in the warranty of title.

SAM C. HARDIN for appellant.

CLAY & BOREING for appellees.

OPINION OF THE COURT BY JUDGE NUNN—Affirming.

This is an appeal from a judgment rendered in two consolidated actions. The appellees, R. L. Ewell and America A. Smith, his daughter, were the plaintiffs in each. One action is for the reformation of a deed, and the other is to recover a balance of $4,000 alleged unpaid purchase money for the land conveyed by the deed, although the lien on the land was retained by a mortgage executed simultaneously with the deed, that is, no lien was retained in the deed. The appellant, Sansom, refused to pay the purchase money balance, because of a breach of warranty, as he claims. The appellees insisted that there was no breach of warranty, but that the deed, by oversight or mistake of the draughtsman and the parties thereto, omitted to except from the deed that part of the property which appellant says he did not get and which constitutes the breach, so that about the only

question in the two cases is, whether there was a mistake in the deed with reference to the matter complained of.

The appellees, owned about 16,000 acres of wild or unimproved lands in Laurel County. About 1,500 acres of it was owned by Ewell individually, and the balance of it was owned by appellees as partners. They desired to sell this land, and some time prior to the month of April, 1906, they gave Siler and Griffiths, real estate men of Tennessee, an option to purchase the same. In April, 1906, Griffiths and Siler procured the assistance of W. K. McClure, a real estate dealer in Knoxville, Tennessee. McClure sought to sell the lands to W. B. Townsend, of Townsend, Tennessee, and Townsend became very much interested in the project. It seems that Townsend was an experienced timber man, and some time in the month of May of that year, Siler, Griffiths, McClure and Townsend went to Laurel County, and in company with appellee, Ewell, rode over the land, and in that way inspected the timber, and examined the coal prospects on it. Townsend was so well pleased with the proposition, that he desired Colonel Ewell to purchase or secure options on other lands adjacent to his. In order to comply with this request, Colonel Ewell let it be known that Mr. Townsend would have to lend him the money, as much as $6,000 anyway.

Between the time of this inspection trip and June 9th, 1906, Colonel Ewell and a son had one or more conferences at Knoxville with the parties mentioned, and on June 9th, executed an option contract, which R. H. Sansom, attorney for Mr. Townsend had prepared. The option contract provided, however, for the sale to R. H. Sansom, as trustee, instead of to Mr. Townsend, as the appellees had expected. The option contract gave the appellant, as trustee, one year in which to close the trade, and simultaneously with the option contract, the appellees executed and placed in escrow with a Knoxville bank, a deed of conveyance to Sansom, as trustee. At the same time the appellees executed to Townsend a mortgage to secure the payment of the $6,000, which they borrowed for the express purpose of acquiring title to the adjacent lands. This option contract, deed in escrow, and mortgage, all prepared by appellant, described and covered the 16,000 acres of land above referred to with warranty of title and possession. The contract price in the option was $5.50 per acre, to be as-

certained as a result of abstract of title and survey of the land to be made during the term of the contract. At the time Ewell went down to Knoxville and made these contracts, he carried with him, and delivered to appellant, his title papers and what he thought was a sufficient abstract. Among these papers was a copy of an unrecorded deed or contract of sale which Ewell and Smith had executed to the Bauer Cooperage Company in 1899. By this contract Ewell and Smith sold to the Cooperage Company all of the timber twelve inches in diameter and over growing on 11,000 acres of this land, situated north of what is frequently referred to in the case as Sublimity road, giving to the Cooperage Company 15 years from the date of the contract in which to remove the timber. These facts are not in dispute. Colonel Ewell, and his son, who was present at the time, also, swear that they called attention to the fact that on the same date they had executed to one Warner a similar contract for the timber growing on 3,000 acres of the land located just south of the Sublimity road. They explain that this Warner contract, however, was of record, and that Warner had transferred his rights in the timber to D. C. Edwards. The appellants deny that any representations were made or information given by the Ewells or any one with reference to the sale of the timber to Warner or Edwards on the 3,000 acres south of Sublimity road. It is the value of or title to the timber on this 3,000 acres that gives rise to this controversy, and constitutes the breach of warranty relied on by appellants.

In form, at least, the abstract was not satisfactory to the purchaser and after some parleys it was agreed that Mr. Hardin, at present attorney for appellant, should make the abstract. There is a conflict in the evidence as to which side he represented in that work. It seems that it was Mr. Townsend's plan to organize a company, or secure the assistance of other parties in making the purchase, and to that end had employed a Mr. Cunningham, a coal expert, to examine and report on the coals. From some letters in evidence it appears that the report of Mr. Cunningham as to the coals was not as favorable as had been anticipated. At all events, during the winter following, word came to Colonel Ewell from Mr. McClure that the deal had fallen through, because of Mr. Cunningham's unfavorable report, and the failure on that account of any other parties to join with Mr.

Townsend in making the purchase. But McClure also stated that he believed he could get Mr. Townsend to make the purchase anyhow, if Ewell would reduce the price per acre. Ewell at first refused to make any concession in price, but finally, and on the 23rd day of February, 1907, Ewell and Smith entered into a new contract with Townsend agreeing to convey the land at the price of $3.75 per acre, and the time of closing the deal was extended so as to permit a further survey and more thorough abstract of the title. On July 16th, 1907, the trade was finally closed and R. H. Sansom having already prepared the deed at his office in Knoxville, brought it to Laurel County for execution by Ewell and Smith. The deed was voluminous and, as copied into this record, contains forty-seven typewritten pages. The land is described by an outside boundary, and fourteen pages of the record are taken up with the description of lands excepted from this outside boundary, and five pages detail the sources of title. The deed is made to Sansom, as trustee, but fails to show for whom he is acting. Sansom and his witnesses in their testimony refuse to disclose for whom he holds title.

The recited consideration is $16,000 cash paid and other valuable consideration, "not necessary to be here stated."

Mrs. Smith is a small factor in all of these negotiations, and it is not contended that she did anything more than rely upon her father, Colonel Ewell, to protect her interests. It is agreed that she was present with Colonel Ewell when the deed was signed in London, and heard Sansom read over the granting, habendum and warranty clauses. It is not pretended that any other portions of the deed were read or heard read by Ewell or Smith. Colonel Ewell was more than seventy years old and almost totally blind, and, except by the aid of a magnifying glass, could not read at all.

The deed contains no exception of the timber conveyances which had been made several years before to the Bauer Cooperage Company and to Warner and Edwards. In fact, nothing was excepted from the conveyance except four tracts of land above referred to, which require fourteen pages of the deed to describe, and no one claims or swears that these pages of the deed containing the exceptions were read or made known to either Ewell or Smith. The appellees, Ewell and Smith, con-

tend and swear that the effect of these prior timber con-
veyances was thoroughly understood by Sansom and
Townsend, and that it was intended by all parties that
the deed should contain an exception to that extent. This
is denied by Sansom, Townsend, and McClure. It is to
this extent that Ewell and Smith seek to have it reformed.

At the time these inspection trips were made by the
parties in interest more than half of the timber had been
cut off of the boundary on each side of Sublimity road,
and men were at work on each boundary then cutting
timber, with mill sets on each working it up. Appellants
admit that they were aware that the timber had been
largely cut by the Bauer Company on the 11,000 acres
north of the road, but that they knew nothing of any
timber having been cut or contract with reference to the
sale having been made, as to the 3,000 acres south of the
road and claimed by Edwards. But from the description
of the physical conditions as detailed by the witnesses,
and the character of investigation they made of it in ad-
vance of the deed, it seems to us that Mr. Townsend could
not have been ignorant of these facts.

It is also clear to us that although the deed was taken
to Sansom as trustee, Mr. Townsend is the beneficiary,
and for that reason Sansom could not plead ignorance.
When the original contract was entered into, Ewell sub-
mitted for their inspection and left in their custody an
abstract which he had prepared, and his title papers.
While this abstract is not in the record and it is not
shown that it made any mention of these two timber con-
tracts, yet it is not denied that Colonel Ewell at the same
time turned over to them a copy of the conveyance he had
made to the Bauer Cooperage Company and called their
special attention to it. He plausibly explains that he de-
livered the copy of this Bauer conveyance because the
Bauer Company had never had the original recorded. He
did not supply a copy of the Warner-Edwards timber
contract because it was on record at the time, but he says
in the same connection, attention was called to both con-
veyances. He further explains that the validity of each
was discussed and the advisability of filing a suit to can-
cel them was considered. Suit was filed by Ewell and
Smith against the Coperage Company before the final
deed was made to appellant, and afterwards suit was
filed by appellant against Edwards. Forfeiture and can-
cellation was claimed because the timber had been cut

contrary to the terms of the contracts. It is not necessary to further consider the ground of forfeiture for the reason that the cases were decided favorably to the Cooperage Company and to Edwards. Anyhow, there is reason to believe that the appellant purposely omitted mention of these two contracts from the deed for fear of adverse effect it might have on probable litigation with the timber claimants. More than this, appellant makes no claim for the breach of warranty with reference to the 11,000 acres claimed by the Cooperage Company, and we are unable to see that it has any greater claim to the 3,000 acres held by Edwards. It is true that Townsend says that while they rode through the 11,000 acres, they went no further than Sublimity road towards the 3,000 acres south of it, and that from this point there was no evidence of timber cutting or mill work anywhere on that side, and that Colonel Ewell represented that there was at least 1,700 acres of virgin timber. While Townsend's knowledge of timber cutting and mill work on this territory is in dispute, Colonel Ewell admits he represented that there was about 1,700 acres of virgin timber south of the road, and insists that his representation was truthful. He explains that the 1,700 acres of virign timber which he refered to was on his individual land, south of the road which he included with the partnership lands in the option contract, while the Edwards' timber contract only covered that portion of partnership land south of the road, 3,000 acres.

The appellant insists that although he may have had constructive or actual notice that the timber had been sold at the time of the purchase and execution of the deed, yet he had a right to rely upon the absolute warranty of title contained in the deed.

This warranty is as follows:

"And said parties of the first part, for themselves and for their heirs, executors, and administrators, do hereby covenant with the said party of the second part his successors, heirs and assigns, that they are indefeasibly seized in fee simple of the property and premises above conveyed, and have perfect right, power and authority to convey same, that said property and premises are free from all encumbrances and that they will forever warrant and defend said property and premises and the title thereto against the lawful claims of all persons whomsoever."

In this connection it should be remembered that there has been no failure of title or breach of the warranty with reference to the acreage conveyed. The alleged breach consists in the loss of the timber on about 3,000 acres, although the facts of the case would as well bear them out in a claim for loss of the timber on the other 11,000 acres, or, in fact, on all the partnership land.

Appellant's constructive notice of the recorded deed, and actual notice of the sale of the 11,000 acres, together with his actual notice of the timber work prior to taking the deed, and their correspondence with reference to the litigation with the timber claimants, support appellees' contention, that appellant in purchasing the land, not only knew of the adverse timber holdings, but agreed to take the land as he found it. This is further borne out by the subsequent modification of the option, where appellee agreed to reduce the price from $5.50 per acre to $3.75 the difference being the value of the timber sold from it, and Ewell swears that it was in answer to that argument of McClure and Townsend's, that he had already received $1.75 per acre, for the timber, and that he could, therefore, very well afford to reduce the price. The same witness who swears to the value of the timber, was introduced by appellant, also swears that the land without the timber at the time of the sale to appellant was worth $5.00 per acre.

We are of the opinion that the evidence upholds the judgment of the lower court to the effect that these timber sales were intended to be excepted from the deed, and not included in the warranty of title. This idea is further supported by the fact that all parties concede that the deed by no means expresses the real trade between them, and, therefore, is not entitled to rank as a shield or bulwark against an attack for fraud or mistake. The true consideration is concealed. It was not a cash deal, for purchase money liens are secured by a mortgage executed simultaneously with the deed; in addition to the $14,000 note, of which the $4,000 sued for in this action is an unpaid balance, the mortgage also attempts to secure the payment of three $24,000 notes, executed by Sansom, trustee, to appellees, and which the appellees then and there endorsed in blank without recourse and re-delivered to appellant. The only way the real con-

sideration can be ascertained is by multiplying the acreage found on survey by the price per acre stated in the modified option contract. No explanation is made, or defense offered, for the other excessive or fictitious values or considerations shown in the mortgage. It is sufficient to say that appellant admits they were a part of the trade, although omitted from the deed.

The deed also omits an exception of the Bauer Cooperage Company timber sale, although appellant does not claim that it was intended to be covered by the warranty. The $6,000 mortgage to Townsend above referred to was recorded, but no claim is made with reference to it by Sansom as a breach of the warranty, although it is not mentioned in the deed.

It is very evident that all of these matters were thoroughly understood between the parties, and that they were never intended to be covered by the warranty clause in the deed. The deed was prepared from the surveyor's notes, which showed the outside and excepted land boundaries, and the warranty was only intended to cover the acreage mentioned.

On the whole case we are convinced the judgment of the lower court in reforming the deed with reference to the timber sale, and directing payment of the balance of the purchase money, is justified by the evidence, and we, therefore, affirm it.